UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 1:21-cr-248(3) - RDM |
| v. : | |
| : | |
| CARRIE ANN WILLIAMS, : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Carrie Williams to 14 days in custody followed by 36 months of probation, 60 hours of community service, and $500 in restitution.

I.  Introduction

Defendant Carrie Williams, a 43-year-old convenience store cashier, along with her co-defendants Aaron Mileur and Tyronne McFadden,[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.

Williams pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, and Picketing in the U.S. Capitol Building. As explained herein, a sentence of home detention is appropriate in this case because, although Williams spent only a brief amount

---

[1] Co-defendants Mileur, Williams, and McFadden are all scheduled to be sentenced on the same date, March 20, 2023, before this Court.

1

of time inside the Capitol building itself, she was part of the large crowd that was pushing toward the Rotunda doors to reach the inside of the building.  Later, she discussed taking steps to remove evidence from social media in coordination with her co-defendant Mileur, and she falsely reported to the FBI that she and her co-defendants were pushed up the stairs toward the Rotunda doors by the crowd, and that they moved off to the side and never entered the Capitol building.

The Court must also consider that Williams's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Williams's crime support a sentence that includes a term of home detention.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 70 (Statement of Offense), at ¶¶1-7.

*Defendant Williams's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Mileur, Williams, and McFadden traveled to Washington, D.C., from Williams's and McFadden's home in Baltimore.  Mileur, who is Williams's cousin, was visiting from his home in Alaska.  They planned to attend the Stop the Steal rally, where Mileur planned to protest Congress's certification of the 2020 Electoral College vote for President.  They arrived at Union Station but were too late to attend the rally.  Instead, they made their way to the U.S. Capitol, where they joined a gathering crowd on the East side of the building.  According to photographs recovered from Williams' Facebook account (Images 1, 2, and 3, below), the three were at the Capitol by no later than 12:25 p.m. (remaining on the grounds until at least 3:19 p.m.).

  

*Image 1: Mileur (left) and McFadden, 12:25 p.m.*   *Image 2: Williams (right foreground), 2:18 p.m.*   *Image 3: Williams (front) and McFadden, 3:19 p.m.*

On the East side of the Capitol grounds, Mileur, Williams, and McFadden joined a gathering crowd. Initially, the crowd congregated behind a U.S. Capitol Police barricade made of conjoined metal bike racks that surrounded the building and was marked with "Area Closed" signs. At around 2:00 p.m., a large crowd of rioters that had breached the barriers from the West side arrived on the East side, and the mob on the East side followed suit. Quickly, the bike rack barricade was broken and the police line was forced to retreat. The crowd took over the East steps leading to the Rotunda doors, as the police retreated up the stairs in an effort to block the doors. At the bottom of the steps, as Mileur later described to the FBI in his post-arrest interview, Mileur saw a young man use a wooden dowel to reach over the police officers' shields and strike the officers. Mileur reported that the young man then dropped the wooden dowel and ran away.

Mileur, Williams, and McFadden joined the tightly packed mob that was pushing up the Capitol steps and toward the doorway. In video of the incident and excerpted below (Image 4), Williams can be seen joining the crowd pushing up the steps and advancing toward the overrun

police line and the recently opened Rotunda doors.



*Image 4: Williams (circled in red) advancing up the stairs toward the Rotunda doors*

As Mileur later described in an interview with the FBI, he saw people around him suffering the effects of pepper spray in their eyes. He said he used water bottles he had brought with him to help rinse out the eyes of those rioters who had been pepper sprayed. As he went to throw away the empty bottles, he was temporarily separated from Williams and McFadden.

All three co-defendants made their way through the push up to the top of the stairs and into the Capitol building's interior at around 2:46 p.m. (Image 5, below). As they crossed the threshold, they would have heard the very loud blaring alarm that was continuously sounding from the breached and broken Rotunda door.



*Image 5: Surveillance video showing Mileur, Williams, and McFadden entering the foyer*

From the foyer where they entered, Mileur, as well as Williams and McFadden, quickly found their way to the Rotunda, the heart of the Capitol building. They can be seen on surveillance video taking photos as they marched through the room. Mileur filmed video of himself and his companions and posted it to his Facebook page (Images 6, 7, 8, and 9, below). They left the Rotunda a few minutes later, exiting the building at 2:51 p.m.



*Image 6: Surveillance video showing Mileur and Williams in the Rotunda*



*Images 7, 8, and 9: Screenshots of video posted to Mileur's Facebook account, later removed, showing Mileur, Williams, and McFadden inside the Capitol Rotunda*

As they left, Mileur saw and heard "flash bangs and tear gas[,]" as he reported to a Facebook friend after the fact. He later told the FBI that the tear gas in the air was so thick that he could not see very well. Nevertheless, the three remained on Capitol grounds for at least another 20-30 minutes, if not more.

During that time, Williams and McFadden spoke to an interviewer from "Young Patriot News" about what had transpired (excerpted at Image 10, below). At 7:08 minutes into the video, which is available at https://www.youtube.com/watch?v=LeRYX4LOzYw, another rioter standing near Williams reported, "We were definitely within the first 100-150 people to get in that building," to which Williams responded, "Yeah, we were too, we definitely were too." Then McFadden added, "They were going to lock us in there, you feel what I'm saying? They bombed us twice." At approximately 9:31 minutes into the video, Williams added, "[W]e made it out safe. We're good. We made history. We was not expecting this mess at all today. But we did it. We're here. We're still alive, we're still kicking."



*Image 10: McFadden and Williams speaking to camera outside the Capitol*

7

The day after the riot, on January 7, 2021, Williams and Mileur discussed the possible consequences of their actions and described taking down their Facebook posts. They had the following exchange through Facebook:

| | |
|---|---|
| Williams: | So the news said the government wants people to turn over any videos of people who stormed the capital |
| Mileur: | Dont |
| Williams: | Im not lol |
| Mileur: | Have u taken it down yet |
| Williams: | Yes |
| | […] |
| Williams: | Still had a blast but calling us domestic terrorist |
| Mileur: | I noticed |
| Williams: | Im not taking the pics down though |

In other words, knowing that the government was looking for evidence of the takeover of the Capitol building, Mileur and Williams discussed removing that evidence from public view and, presumably, from the government's reach.

*Defendant Williams's and McFadden's Post-Arrest Interview*

On March 9, 2021, long before Williams and McFadden were arrested and about one week before Mileur was arrested, FBI agents contacted Williams and McFadden by telephone and asked for an interview. They agreed to speak with the agent over the phone. Together, Williams and McFadden described their attendance at the events at the Capitol on January 6, 2021. While they were cooperative insofar as they agreed to provide information to the agents, their descriptions of what happened on January 6 contained material falsehoods.

Williams and McFadden accurately reported that they traveled to DC with Mileur, and the three of them walked to the Capitol building together. They claimed that when they arrived at the Rotunda steps, they were pushed by the large crowd behind them and forced up the stairs.

8

Williams and McFadden reported that they were able to break free from the crowd and move off to the side before the crowd entered the Capitol building. They falsely insisted that they never went inside. In reality, while Williams and McFadden could have stepped aside and declined to enter the building, they did not. As the video evidence described above shows, they voluntarily entered the building. And as their interview with Young Patriot News suggests, they were triumphant about that achievement.

Williams and McFadden described that they observed a lot of pushing and shoving in the crowd. They saw one man using what appeared to be a police shield to push his way through the crowd toward the stop of the stairs and the Rotunda door. They claimed, against the evidence, that the sole police officer at the top of the stairs eventually opened the door and let the crowd inside. They acknowledged, however, that the crowd was attempting to force the door open before the officer stepped aside.

*The Charges and Plea Agreement*

On March 9, 2021, the United States charged co-defendant Mileur by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). He was arrested in Anchorage, Alaska, on March 16, 2021. On March 24, 2021, the United States charged Mileur by a four-count Information charging the same offenses.

The government filed a criminal complaint charging Williams and McFadden with the same four offenses on June 10, 2022. They were notified of the charges against them on approximately July 19, 2022, but due to concerns about Williams's health, they were not arrested. Instead, FBI agents helped arrange for Williams and McFadden to self-report and attend an initial appearance before this Court on August 30, 2022, in case number D.D.C. 22-mj-136.

On September 7, 2022, the United States filed a superseding Information charging Mileur,

McFadden, and Williams together, again with the same four offenses. On December 21, 2022, pursuant to plea agreements, Mileur, Williams, and McFadden each pleaded guilty to Count Four of the Information, charging them with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. In their plea agreements, Mileur, Williams, and McFadden each agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties

Williams now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Williams faces up to six months of imprisonment and a fine of up to $5,000. Williams must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 90 days of home detention as part of 36 months of probation, and 60 hours of community service.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy. *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Williams's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Williams, the absence of violent or destructive acts is not a mitigating factor. Had Williams engaged in such conduct, she would have faced additional criminal charges.

Although Williams was not inside the Capitol building for an extended time, she and her co-defendants pushed their way up the Rotunda stairs, knowing that the crowd was forcing its way past the outnumbered police force.  Williams's "man on the street" interview with Young Patriot News makes clear that she knew the gravity of what was happening all around her.  She and McFadden expressed relief at having made it out of the situation unharmed.  Significantly, Williams later lied to the FBI, pretending she had never entered the building at all.  While there are mitigating aspects of her conduct that lead the government to not seek a custodial sentence in this case, the aggravating factors warrant a significant period of home detention along with a lengthy period of probation.

### B. The History and Characteristics of Williams

As set forth in the PSR, Williams is a resident of Baltimore, Maryland, and works as a cashier at a convenience store.  ECF 79, ¶73.  She reported to the Probation Office that she had a turbulent and difficult childhood, and that she resided in 56 different foster homes and group

11

homes. *Id.*, ¶59. She has two adult children and two younger children who reside with their father. *Id.*, ¶¶61-62. She suffers from a number of significant health issues and receives mental health treatment. *Id.*, ¶66.

Her criminal history, as set forth in the PSR, is lengthy, indicative of a troubled young adulthood. *Id.*, ¶¶27-36. While on the whole, Williams's criminal convictions are for relatively less serious crimes, she repeatedly failed to complete her probationary periods successfully. According to the PSR, for example, she has had probation revoked or terminated following at least eight of her criminal convictions—sometimes more than once. *Id.*, ¶¶27, 29, 30, 31, 32, 33, 34, 36. Although it appears she was not sentenced to serve time in custody for any of the original offenses, after unsuccessful probationary periods she was ordered to jail for 15 days in July 2009 (PSR ¶34), another 90 days in February 2011 (PSR ¶31), and 60 days in June 2014 (PSR ¶36). Particularly troubling, in 2009, she pled nolo contendere to an incident of child abuse, for which she was sentenced to 24 months of probation and 100 hours of community service. *Id.*, ¶35.

On the other hand, Williams' history of criminal convictions has improved considerably in recent years. Her most recent conviction stems from conduct in December 2010. *Id.*, ¶36. Since that time, more than a dozen years ago, it appears she was arrested one time, for driving with a suspended license in 2015. *Id.*, ¶54. This suggests that Williams's life is on a significant upward trajectory, and supports the government's recommended sentence that does not include time in custody. However, a significant period of home detention is warranted, particularly in light of the many second chances Williams has received from courts in the past.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

12

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Williams's significant history with the criminal justice system suggests the need for specific deterrence in this case. Despite numerous prior arrests and ten convictions in criminal cases, Williams did not stay away from the mayhem and violence at the Capitol on January 6.

Accordingly, a sentence that will impose meaningful consequences is appropriate here to deter any similar behavior in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

The government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Williams based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Williams has pleaded guilty to Count Four of the Superseding Information, charging Parading, Demonstrating, and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of

15

minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom.

*See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this Court should consider the sentence of home detention as a condition of 36 months' probation imposed in *United States v. Nicholas Reimler*, D.D.C. 1:21-cr-00239. Reimler entered the Capitol through the Senate Wing Door, took videos as he marched around the Crypt, and left the building of his own accord after around 19 minutes. Like Williams, the Reimler posted those videos to social media. But while Williams lied to the FBI and reported that she had not entered the Capitol building at all, Reimler admitted his misconduct. And unlike Reimler, Williams discussed removing her social media posts after learning about the investigation. This Court sentenced Reimler to 30 days of home detention, whereas here, accounting for these differences and Williams's criminal history, the government recommends a longer term of 90 days.

This Court should also consider the sentences to be imposed for Williams's co-defendants. The government is recommending that all three defendants be sentenced to the same terms: 90

17

days of home detention as part of 36 months of probation, 60 hours of community service, and $500 in restitution. Even more so than Williams, Mileur took steps to remove evidence from the reach of law enforcement officials after realizing that their conduct was under investigation. There is no evidence that McFadden and Williams witnessed assaults on the police, unlike Mileur, but they both gave untruthful accounts of their activities to FBI agents when they were interviewed telephonically in 2021. And, although no evidence suggests that McFadden deleted messages or photos to remove them from law enforcement, unlike his co-defendants, he has a more serious criminal history and reported violations of his conditions of release even in this case. Accordingly, while the mix of aggravating and mitigating factors is somewhat different for each of the co-defendants, ultimately, the government requests that each be sentenced to the same terms.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**V.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence defendant Carrie Williams to 90 days of home detention as part of 36 months of probation, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ *Emily W. Allen*
EMILY W. ALLEN, Cal. Bar No. 234961
Assistant United States Attorney
601 D Street, N.W.
Washington, DC 20530
emily.allen@usdoj.gov
(907) 271-4724